## UNITED STATES v. CUNHA.
### No. 4777.

United States Court of Appeals,
First Circuit.

Jan. 8, 1954.

Charles F. Choate, Asst. U. S. Atty., Boston, Mass. (Anthony Julian, U. S. Atty., Boston, Mass., on the brief), for appellant.

William Channing Beucler, Boston, Mass., for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

The United States has taken this appeal from an order of the United States District Court for the District of Massachusetts admitting the petitioner-appellee to citizenship. There can be no question of the jurisdiction of the court below, or of ours under Title 28 U.S.C. § 1291, Tutun v. United States, 1926, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738; Stasiukevich v. Nicolls, 1 Cir., 1948, 168 F.2d 474, 477, and there is no dispute as to the evidentiary facts.

The petitioner is of Portugese nationality, having been born in the Cape Verde Islands in 1897. He legally entered the United States in 1916 and has continuously resided in the Commonwealth of Massachusetts since 1927. In

1940 he filed his Declaration of Intention in the court below and on February 13, 1947, he petitioned that court for naturalization. All formal requirements, including the affidavits of two witnesses, have been complied with to the letter.

When Cunha's Petition for Naturalization came up for hearing in open court in January, 1951, the duly designated examiner of the Immigration and Naturalization Service in attendance recommended denial of the petition on the ground of character, and in support of his recommendation submitted a certified copy of the record of Cunha's conviction on July 19, 1948, in the Municipal Court of the City of Boston on a charge of attempted larceny of an automobile. Counsel for Cunha conceded the accuracy of the record, but told the court that actually a mistake had been made in arresting Cunha on the charge. He told the Court that Cunha had participated with a friend in perpetrating a joke upon a fellow member of their club by attaching a rocket to the latter's automobile which would explode when the car was started, and that the owner of the car, apparently not viewing the act in the light intended, reported the matter to the police and had Cunha arrested on the charge of attempted larceny of the automobile. To this statement counsel added that he had half a dozen letters from persons interested in Cunha, including one from the pastor of his church, all attesting Cunha's good character; that Cunha was a steady worker with a good record of employment; that ever since the rocket episode Cunha's conduct had been exemplary, and then counsel characterized the incident as "one of those things that happen." When the representative of the Immigration and Naturalization Service was asked by the court for comment "about this happening," he handed up the record of Cunha's conviction and indicated that he stood upon that alone, whereupon the court, after reading the record, said: "I think I will continue the case for a

year for good behavior. In the meantime I think the Government should make a careful investigation." An order to that effect was duly entered.

Two and one half years later, on June 15, 1953, Cunha's petition came on for hearing again. The proceedings at that time were so brief that they may as well be reproduced here in full.

"Mr. Gerrig:[1] This petition was recommended for denial before this Court on January 22, 1951, and after a hearing this Court continued the case for one year on good moral character. His record has been checked, and he has not been arrested since his last arrest. His last arrest was for attempted larceny of an automobile, and the Government still recommends that this petition be denied because it occurred during the statutory period. .

"The Court: Well, if I continued it for good behavior and he has behaved, I think I will admit him."

The Oath of Allegiance was accordingly administered to Cunha and the court thereupon entered the order admitting him to citizenship from which the Government has taken this appeal.

■ The applicable statute is not, as counsel for the United States contends, the Immigration and Nationality Act, 66 Stat. 163, 8 U.S.C.A. § 1101 et seq., passed by Congress over presidential veto on June 27, 1952, which, by the terms of its § 407 went into effect with an exception not here material 180 days thereafter. The applicable statute is the Nationality Act of 1940. 54 Stat. 1137. The reason for this is that § 405(b) of the Immigration and Nationality Act (1952) categorically provides that except as otherwise specifically provided in its Title III, "any petition for naturalization heretofore filed which may be pending at the time this Act shall take effect shall be heard and determined in accordance with the requirements of law in effect when such petition was filed."

1. Mr. Gerrig is the duly authorized examiner who represented the Immigration and Naturalization Service at both hearings.

And, although Congress saw fit to provide specifically that § 313 and § 315[2] of Title III forbidding, respectively, the naturalization of persons who, broadly speaking are, or are likely to be, violently opposed to our form of government, or who claimed alienage to avoid military service, shall apply as of the applicable date of the Act notwithstanding the provisions of § 405(b), Congress did not see fit to make a like specific provision in § 316 wherein five years residence immediately preceding petition for naturalization, and "good moral character" during such residence, are made conditions precedent to naturalization. Thus we are not concerned with "good moral character" as that phrase is defined in detail in § 101(f) of the Immigration and Nationality Act. Instead we are concerned with "good moral character" as that phrase was used without any attempt at precise definition in § 307(a) of the Nationality Act of 1940. 54 Stat. 1142.

The Government takes the position that conviction of any felony involving moral turpitude, and attempted larceny of an automobile is such a felony in Massachusetts, within the statutory five-year period conclusively establishes bad moral character.[3] We do not agree.

Section 307(a) of the statute with which we are concerned, as we have already noted, does not make any attempt to define "good moral character" with any degree of precision, but leaves that issue at large for determination in each case as a matter of fact. Daddona v. United States, 2 Cir., 1948, 170 F.2d 964. See also Stasiukevich v. Nicolls, 1 Cir., 1948, 168 F.2d 474, 478. Although we may concede that conviction of a crime, particularly if it be a felony involving moral turpitude, is strong evidence of bad moral character, nevertheless we think that if Congress in 1940 had intended to make the commission of such a crime an absolute bar to naturalization, it would have said so, as it made commission of a felony or misdemeanor involving moral turpitude a bar to the admission of aliens in the Immigration Act of 1917, 39 Stat. 875, and still does as to some crimes, 66 Stat. 182, and as it did later in specific detail in 1952 with respect to naturalization in § 101 (f) of the Immigration and Nationality Act. The absence of such specific provision in the 1940 Act we think makes it evident that at that time Congress must have intended by using general language to establish an elastic test for good moral character, see Schneiderman v. United States, 1943, 320 U.S. 118, 139, 63 S.Ct. 1333, 87 L.Ed. 1796, and having done so it is not our province to limit the generality of its language by adding to the statutory requirement a rigid limitation with respect to commission of crime. See Tutun v. United States, 1 Cir., 1926, 12 F.2d 763, 764.

Furthermore, no cases from any appellate court have been cited to us, and we have found none, sustaining the Government's contention. On the contrary, there are several cases,[4] of which Repouille v. United States, 2 Cir., 1947, 165 F.2d 152, is typical, wherein either a conviction or an admission by the petitioner himself established the commission by the petitioner for naturalization of a crime involving moral turpitude within the five-year period, but the courts did not deny naturalization out of hand on that ground. Instead the courts carefully examined the particular criminal act, in the Repouille case manslaughter for chloroforming an infant

---

2. See also § 318 and § 331.

3. Although the Government asserts that the Immigration and Naturalization Act applies, it has not based its argument upon § 101(f) of that Act defining "good moral character." Instead it seems to argue its case on the basis of the general provisions of either § 316 of the later

Act or § 307(a) of the Nationality Act of 1940 which we are considering.

4. See Petitions of Rudder, 2 Cir., 1947, 159 F.2d 695, distinguishing Estrin v. United States, 2 Cir., 1935, 80 F.2d 105, wherein extenuating circumstances were not advanced by the petitioner, and also Petition of R———, D.C.D.Mass.,1944, 56 F.Supp. 969.

son, blind, mute, idiotic and monstrously deformed from birth, to determine whether there were extenuating circumstances surrounding the commission of the crime which removed or palliated the blot on moral character normally incidental to the act. We shall do the same here, and we, therefore, turn to a consideration of the nature of the act for which Cunha was convicted in the Municipal Court of the City of Boston, and the circumstances surrounding its commission.

From the attested copy of the pertinent record of that court reproduced in the appendix to the appellant's brief it appears that Cunha was arraigned on July 19, 1948, to answer to a complaint sworn out by one John Stavaridis charging attempted larceny of the latter's automobile by taking hold of a door with the alleged intent of entering the vehicle in order to steal it. He plead not guilty but upon trial he was found guilty and sentenced to two months hard labor in the House of Correction. Immediately at the conclusion of the hearing he appealed to the Superior Court of the Commonwealth, but later on the same day he withdrew his appeal and the court thereupon suspended the execution of the sentence it had imposed and placed Cunha on probation, one of the conditions of which was that he present himself before the court six months later. He duly appeared before the court on January 19, 1949, whereupon the court ordered the complaint dismissed.

Up to this point in the opinion we have treated the record of the Municipal Court of the City of Boston summarized above as proof positive of the petitioner's conviction for the crime of attempted larceny of an automobile, and hence as definitely establishing his commission of that criminal act. We are not entirely satisfied that this is so, however, because the Municipal Court eventually ordered the complaint dismissed. It may be, indeed at first glance it would seem, that this order has the effect of expunging the record of conviction, and thus of wiping out proof of the commission of the crime so completely that it ought not to be considered at all in passing upon Cunha's moral character. On the other hand, the order of dismissal may amount to no more than a discharge from probation as the Government suggested at oral argument. Or, perhaps, the Municipal Court found Cunha worthy of relief from all penalties and disabilities resulting from his conviction, and, in spite of lack of statutory authority, adopted a procedure to attain that end akin to that authorized by the California Penal Code considered by the court in In re Paoli, D.C.N.D.Cal.1943, 49 F.Supp. 128.

■ We find no authority in the Massachusetts statutes for the procedure adopted by the Municipal Court of the City of Boston in this case, and while we do not doubt that court's power under the Common Law of Massachusetts to take that procedure, we are at a loss to know what it means or implies with respect to Cunha's guilt, or, if technically guilty, his moral culpability. Moreover, we are at a loss to know whether or not the District Court accepted the explanation made by Cunha's counsel of the circumstances surrounding Cunha's arrest and conviction as true, and if it accepted the statement as true, whether it considered that Cunha's moral character emerged unscathed from the prank. The record is too meager for us to exercise our appellate function intelligently with the result that we must send this case back for retrial as we did in Stasiukevich's case cited above.

■ We are aware that in cases like this wherein a duly authorized examiner has conducted a statutory preliminary hearing, § 334(b) the Nationality Act of 1940 * leaves the taking of sworn testimony at the trial to the discretion of the naturalization court unless the petitioner makes a demand therefor. Nevertheless, orders in cases of the present nature are appealable, Tutun v. United States, 1926, 270 U.S. 568, 46 S.Ct.

* Now Immigration and Nationality Act, § 336, 8 U.S.C.A. § 1447.

425, 70 L.Ed. 738 and whenever the naturalization court disagrees with an examiner's recommendation and admits to citizenship we think it encumbent upon that court to see that a record is made upon which the appellate court can perform its function. See Petition of Zele, 2 Cir., 1942, 127 F.2d 578.

The order of the District Court granting the petition for naturalization is vacated and the case is remanded to that court for further proceedings not inconsistent with this opinion.