## IN THE MATTER OF THE PETITION OF MARCO REGI-
## NELLI, FOR NATURALIZATION.

Atlantic County Court

Decided July 20, 1955.

*Messrs. Lemuel B. Schofield, John B. Brumbelow,* and *Edward I. Feinberg,* for petitioner.

*Mr. Herbert M. Levy,* for the Government.

NAAME, J. C. C. The final hearing of the petition for naturalization of one Marco Reginelli came before this court on June 21, 1955, at Mays Landing, Atlantic County, New Jersey. Prior to this hearing briefs were submitted to this court by Herbert M. Levy, Esquire, the designated Federal Examiner for the Immigration and Naturalization Service, and Lemuel B. Schofield, Esquire, John B. Brumbelow, Esquire, and Edward I. Feinberg, Esquire, counsel for the petitioner. Both briefs contained a most adequate treatment of the subject matter and revealed exhaustive research as to the applicable authorities on the law at issue. This court carefully considered all of the facts presented and examined in detail all the authorities noted in the briefs, in addition to related cases not mentioned in the written arguments.

On the date of the hearing counsel for the Government, in open court, abandoned all (except one) contentions contained in the government findings and conceded that they were without merit, except point (j) in paragraph 4 under Statements of Fact, (a) to (k) inclusive, which charges "that the petitioners accounting for this large income is not believable, and leaves the source of this income unexplained." These admissions reduce the issues in this matter to one single challenge.

In addition to the foregoing the Government also concedes:

(1) That the Nationality Act of 1940, Section 307(a)[1] applied to the petitioner and that the Immigration and Nationality Act of 1952, 8 *U. S. C. A.* § 1101 *et seq.*, did not apply. Section 307(a) of the Nationality Act of 1940, the section of the law under which this petition was filed, reads as follows:

"No person, except as hereinafter provided in this Act, shall be naturalized unless such petitioner, (1) immediately preceding the

---

[1] Now Immigration and Nationality Act, 8 *U. S. C. A.* § 1427(a).

date of filing petition for naturalization has resided continuously within the United States for at least five years and within the State in which the petitioner resided at the time of filing the petition for at least six months, (2) has resided continuously within the United States from the date of the petition up to the time of admission to citizenship, and (3) during all the periods referred to in this subsection has been and still is a person of good moral character." (54 *Stat.* 1142, 8 *U. S. C.* 707)

A recent case, *U. S. v. Cunha,* 209 *F. 2d* 326, 328 (1 *Cir.*, 1954), supports this view and holds that:

"The Immigration and Nationality Act, 66 *Stat.* 163, 8 *U. S. C. A.* § 1101 *et seq.*, passed by Congress * * * on June 27, 1952, * * * went into effect with an exception not here material 180 days thereafter. * * * § 405(b) of the Immigration and Nationality Act (1952) categorically provides that except as otherwise specifically provided in its Title III, 'any petition for naturalization heretofore filed which may be pending at the time this Act shall take effect shall be heard and determined in accordance with the requirements of law in effect when such petition was filed.' And, although Congress saw fit to provide specifically that § 313 and § 315 of Title III forbidding, respectively, the naturalization of persons who, broadly speaking are, or are likely to be, violently opposed to our form of government, or who claim alienage to avoid military service, shall apply as of the applicable date of the Act notwithstanding the provisions of § 405(b), Congress did not see fit to make a like specific provision in § 316 wherein five years residence immediately preceding petition for naturalization, and 'good moral character' during such residence, are made conditions precedent to naturalization. Thus we are not concerned with 'good moral character' as that phrase is defined in detail in § 101(f) of the Immigration and Nationality Act. Instead we are concerned with 'good moral character' as that phrase was used without any attempt at precise definition in § 307(a) of the Nationality Act of 1940."

(2) That the authorities are unanimous in the opinion that character is not synonymous with reputation, since character refers to what a person really is and not what he is supposed to be.

In *Ralich v. United States,* 185 *F. 2d* 784, at *page* 786 (8 *Cir.*, 1950), the court said:

"It is first worthy of note that the statute does not prescribe as a condition for naturalization that the applicant be a person of

good repute during the five-year period, but that during that period he shall be a person of good moral character. Character implies moral qualities which belong to and distinguish an individual person. It signifies the reality as distinguished from reputation or the opinion generally entertained of him. * * * In *Sloan v. United States, supra* [8 *Cir.*, 31 *F.* 2*d* 902], Judge Stone, speaking for this court, said: 'Character is what a man really is. Reputation is what the general run of people who know him think he is.' "

To the same effect see *In re Bonner*, 279 *F.* 789 (*D. C. Mont.* 1922); *In re Capozzi*, 160 *Misc.* 200, 289 *N. Y. S.* 869 (*Sup. Ct.* 1936); *In re United States v. Hrasky*, 240 *Ill.* 560, 88 *N. E.* 1031 (*Sup. Ct.* 1909).

(3) That all references in the government's argument relating to the petitioner's arrest and bad moral character prior to the stipulated period of five years immediately preceding the filing of the petition up to and including the final date of hearing, are merely used for background purposes and are conceded to be without merit regarding the law at issue in this matter. The government admits further (a) "that there is no record of arrests concerning the petitioner since 1942," (b) "that there is no evidence other than hearsay or rumor connecting the petitioner with any illegal business within the statutory period," (c) "he is apparently living in a very quiet and retiring manner."

This court is concerned with the term "good moral character," its meaning, definition and application in this hearing. The government contends that the requirements under the 1940 act are not easily defined and that standards of morality may vary at different times and in diverse regions. The court agrees with this view and notes that a careful perusal of the submitted brief reveals that, in substance, it deals with what this petitioner is supposed to be at present based on his reputation in the past. The itemized lists of arrests end in 1942. The itemized list of 1953 newspaper references resulted from deportation proceedings instituted at that time against the petitioner and reflect a prior reputation rather than a current one.

A search of the entire brief does not contain a scintilla of actual or real evidence that the petitioner, since 1942, has engaged in any illegal enterprise or been involved in any misconduct of the type that created his former bad reputation. In fact the Government submits that since 1942 there has been no arrest record, that he is apparently living in a very quiet manner, and that any conclusions by the Government regarding illegal gambling, *etc.*, are the result of rumor and hearsay. It would appear that the investigative facilities available to the service most certainly would have revealed any misconduct of this petitioner who, evidently, has been the object of very close scrutiny since 1942. In the absence of actual proof it would be a miscarriage of justice to resort to rumor and hearsay or even unsupported circumstantial evidence to create a present bad reputation and poor moral character on one acquired some years prior to the statutory period in this matter.

To return to "good moral character" and its application, Section 307(a) of the statute with which we are concerned, as we have already noted, does not make any attempt to define "good moral character" with any degree of precision but leaves that at large for determination in each case as a matter of fact.

See *Daddona v. United States,* 170 *F.* 2d 964 (2 *Cir.,* 1948).

In *United States v. Cunha, supra,* 209 *F.* 2d 326, at *page* 329 (1 *Cir.,* 1954), it was held that:

"Although we may concede that conviction of a crime, particularly if it be a felony involving moral turpitude, is strong evidence of bad moral character, nevertheless we think that if Congress in 1940 had intended to make the commission of such a crime an absolute bar to naturalization, it would have said so, as it made commission of a felony or misdemeanor involving moral turpitude a bar to the admission of aliens in the Immigration Act of 1917, 39 *Stat.* 875, and still does as to some kinds, 66 *Stat.* 182, and as it did later in specific detail in 1952 with respect to naturalization in § 101(f) of the Immigration and Nationality Act. The absence of such specific provision in the 1940 Act we think makes it evident that at that time Congress must have intended by using general language to establish an elastic test for good moral character, see *Schneider-*

man v. United States, 1943, 320 U. S. 118, 139, 63 S. Ct. 1333, 87 L. Ed. 1796, and having done so it is not our province to limit the generality of its language by adding to the statutory requirement a rigid limitation with respect to commission of crime. See Tutun v. United States, 1 Cir., 1926, 12 F. 2d 763, 764."

In *Daddona, supra,* Daddona killed a man on June 6, 1942, and was sentenced to five years' imprisonment on September 23, 1942. He was paroled in 1945 and received an executive pardon on May 5, 1947. On July 18, 1947, he filed a naturalization petition and in 1948 the court ruled that under the decisions of the United States Court of Appeals, good moral character during the prescribed period is the only test of fitness prescribed by the statute. In fact, in the *Daddona* case the court ruled good behavior of the petitioner and gave him credit for the time he spent in incarceration.

Also see *Petition of Zele,* 127 F. 2d 578, 580 (2 Cir., 1942) ; Id., 140 F. 2d 773, 776 (2 Cir., 1944).

*Repouille v. United States,* 1947, 165 F. 2d 152 (2 Cir., 1947), a manslaughter case, is typical, wherein either a conviction or an admission by the petitioner himself established the commission of a crime involving moral turpitude within the five-year period, but the courts did not deny naturalization out of hand on that ground.

*Petitions of Rudder,* 159 F. 2d 695, 698 (2 Cir., 1947), states that morality is not to be measured by conventional formality, nor are the *mores* of a community static. In one of the petitions one Jannibelli, whose wife refused to give him a divorce, maintained an adulterous relationship with an unmarried woman for eight or nine years and the court held "We do not believe that the present sentiment of the community views as morally reprehensible such faithful and long continued relationships under the circumstances here disclosed." The petition was granted with the observation that there is an increasingly liberal trend in naturalization cases.

In *United States v. Cunha,* 209 F. 2d 326, 329, it was held that an alleged conviction during the statutory period, of attempted larceny of an automobile, which in Massachusetts

constituted a felony involving moral turpitude, did not conclusively establish "bad moral character" within the Nationality Act of 1940.

In the *Petition of Zele, supra,* it was held that the burden of proof to show good moral character rests upon the petitioner, but that good behavior during the five-year period (*i. e.* preceding the date of the petition) is the only test of moral fitness provided in the statute; that under the law the burden is on the petitioner to establish good moral character only during the five-year period and no earlier;

See *Petition of Zele,* 127 *F.* 2d 578 (2 *Cir.,* 1942); *United States v. Clifford,* 89 *F.* 2d 184 (2 *Cir.,* 1937); *United States v. Rubia,* 110 *F.* 2d 92 (5 *Cir.,* 1940); *In Re Aldecoa,* 22 *F. Supp.* 659, 661 (*D. C. Idaho,* 1938).

And it has consistently been construed liberally so as to sanction forgiveness after the expiration of five years from the date of a disbarring misdeed:

*In re Trum,* 199 *F.* 361 (*D. C. W. D. Mo.,* 1912); *In re Centi,* 217 *F.* 833 (*D. C. W. D. Tenn.,* 1914); *In re Guliano,* 156 *F.* 420 (*D. C. S. D. N. Y.,* 1907); *In re Nagy,* 3 *F.* 2d 77 (*D. C. S. D. Tex.,* 1924); *In re Schlau,* 136 *F.* 2d 480 (2 *Cir.,* 1943).

The cases are replete in the contention that good moral character for a prescribed statutory period of a petition for naturalization is a question of fact. Although wide discretion is lodged in hearing petitions, discretion cannot be exercised arbitrarily or in manner which adds to requirements of law, which must be construed liberally in favor of the petitioner. Naturalization Act, June 29, 1906, Section 4, Sub-division 4, See *Tutun v. United States, supra.*

It can be observed that there are a great number of cases where the court has construed the act most liberally in favor of the petitioner even where there has been a commission of a crime within the statutory period of five years immediately preceding the filing of a petition. In the present application we have a petitioner against whom there is absolutely no evidence involving bad moral character for a period of over twelve years.

In the instant case the court is now charged with the duty of determining whether the petitioner has borne the burden of proof in establishing "good moral character." The court has before it the following facts: the petition of a resident alien to citizenship who, immediately preceding the date of his application, has resided continuously within the United States five years at least, and within the state or territory where such court is at the time held several sessions a year at least, and that during that time the petitioner, under oath, has sworn that he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same. In addition to the oath of the applicant there is the testimony of at least two reputable witnesses, citizens of the United States, who have, under oath, testified as to the facts of residence, good moral character and attachment to the principles of the Constitution, as required.

Before determining whether the petitioner has borne the burden of proof by conforming to the statutory requirements the court turns its attention to the narrow issue upon which the Government rests its entire case, i. e., points (i) and (j) in the Findings of Fact. This involves the contention that the petitioner derives from $7,200 to $9,600 per year income from a partnership interest he has in a plastic concern, rentals from properties he owns, and interest on government bonds, and yet has been declaring $25,000 and more yearly for income tax purposes. The petitioner has claimed, under oath, that the difference between his listed income and income tax declaration has been made from wagering on horses at the various race tracks. The Federal Examiner contends that this is incredible and not worthy of belief, and that this court should assume that the difference in the two sums is secured illegally. It is not within the province of this court to speculate or guess on an essential fact nor is the court so skilled as to determine the expertness of the petitioner in being able to accrue such winnings and profits by legal

betting at legally established race tracks, two of which are in operation in the immediate vicinity wherein the petitioner resides.

■ Again the court observes that the petitioner has been under minute inspection for a great number of years and not a shred of evidence is produced to support the Government's conclusions of deliberate fabrication. This challenge, therefore, cannot be resolved in the Government's favor. Although the record is not as full as it should be as to the petitioner's actual conduct during the crucial five-year period, it seems clear, except for the challenge here made, his conduct is appropriate to justify naturalization.

Ofttimes a man, who has or is imbued with the highest of "good moral" principles, has fallen or slipped from his lofty perch, and conversely it may be said that many men with records of ill repute have striven, under adverse conditions, to redeem themselves by conforming, conscientiously, to the well-accepted and known rules of society. In either case it is well accepted that all pertinent government agencies have, as one of their primary functions, the obligation to assist in the rehabilitation of man.

In the subject petition we have a petitioner who has met all the statutory requirements as laid down by the Nationality Act of 1940, regarding the statutory period of "five years immediately preceding the filing of his petition." During the statutory period he, apparently, has conducted himself as a law-abiding person. He has engaged in legitimate enterprise and there is no evidence before the court to show any activity that would deny "good moral character" for the prescribed period. His witnesses have sworn, under oath, that he is a reputable man, loyal and attached to the principles of the Constitution of the United States.

The court must assume that the petitioner is sincere in his sworn statements and finds it its duty to aid him in his apparent rehabilitation. A contrary view at this time could result in great injury to the petitioner's morale if his "good moral character" was acquired by conscientious application.

In *Tutun v. United States*, 270 *U. S.* 568, 578, 46 *S. Ct.* 425, 427, 70 *L. Ed.* 738 (1926), Justice Brandeis said:

"The opportunity to become a citizen of the United States is said to be merely a privilege, and not a right. It is true that the Constitution does not confer upon aliens the right to naturalization. But it authorizes Congress to establish a uniform rule therefor. * * * The opportunity having been conferred by the Naturalization Act, there is a statutory right in the alien to submit his petition and evidence to a court, to have that tribunal pass upon them, and, if the requisite facts are established, to receive the certificate. * * * In passing upon the application the court exercises judicial judgment. It does not confer or withhold a favor."

Congress having laid down the rules governing the admission of aliens to citizenship, it is not within the power of the court, in the exercise of arbitrary discretion, to add to them. For the purposes of this petition therefore the court is bound by Section 307(a) of the Nationality Act of 1940 and in pursuance of the intent of that particular act the court finds that the petitioner has met all the necessary requirements of this act and therefore admits the petitioner to citizenship.